ALLIANCE OF AUTOMOBILE
MANUFACTURERS,
Plaintiff,

v.

Dan A. GWADOSKY, et al, Defendants.

No. CIV.03–154–B–W.

United States District Court,
D. Maine.

Jan. 25, 2005.

**98**

Andrew J. Pincus, Mayer, Brown, Rowe & Maw, Washington, DC, Bruce W. Hepler, Friedman, Gaythwaite, Wolf & Leavitt, Harold J. Friedman, Friedman, Gaythwaite, Wolf & Leavitt, Portland, Russell R. Eggert, Mayer, Brown & Platt, Chicago, IL, for Alliance of Automobile Manufacturers, Plaintiff.

Francis E. Ackerman, Assistant Attorney General, Paul Stern, Assistant Attorney General, Augusta, ME, for Secretary of State, Maine, Attorney General, Maine, Defendants.

Michael Kaplan, Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Portland, ME, for Maine Auto Dealers Association, Amicus.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

WOODCOCK, District Judge.

In 2003, the State of Maine enacted legislation creating the Maine Motor Vehicle Franchise Board (the "Board") to oversee compliance with state laws regulating the relationship between automobile manufacturers and their dealers. The Board consists of seven members: three motor vehicle dealers, one manufacturer, two members of the public, and a state employee chair. The Plaintiff is the Alliance of Automobile Manufacturers ("Alliance"), and as the name implies, it is a trade association of automobile manufacturers.[1] To say Alliance does not like the new law is an understatement.[2] It has come to

---

1. The Defendants are Dan A. Gwadosky, in his official capacity as Secretary of State of the State of Maine, and G. Steven Rowe, in his official capacity as Attorney General of the State of Maine (collectively, "the State").

2. The litigious and occasionally rancorous relationship between the manufacturers and their dealers in Maine and elsewhere is a matter of public record. *See New Motor Vehicle Bd. of California v. Orrin W. Fox Co.,* 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978);

court to try and stop it. This Court earlier denied Alliance's request for a preliminary injunction against operation of the law, and the parties have now filed dispositive motions. In its order on the preliminary injunction, this Court ruled on nearly all of the parties' contentions, and it concludes, as to those issues, no further explanation is necessary. However, Alliance has raised a new issue: whether the composition of the Board, with its three to one weighting in favor of the dealers, constitutes a violation of due process. This Court rules the composition of the Board does not violate due process and GRANTS Defendants' Motion for Summary Judgment and DENIES Plaintiff's Motion for Summary Judgment.

## I. FACTUAL BACKGROUND

The history of this case is recited in this Court's preliminary injunction order, *Alliance of Automobile Manufacturers v. Gwadosky*, 304 F.Supp.2d 104 (D.Me.2004). This Court adopts the facts in that order and discusses additional relevant facts below.

## II. LEGAL STANDARD

Because this Court has considered the State's Statement of Material Facts, the State's Motion to Dismiss must be treated as a Motion for Summary Judgment. *See*

*Alliance of Auto. Mfrs. v. Gwadosky*, 304 F.Supp.2d 104 (D.Me.2004).

**3.** The record before this Court on the parties' motions for summary judgment regarding whether Section 10 violates the Contract Clause differs from the record presented on Alliance's Motion for Preliminary Injunction in one respect only: six current Ford dealer contracts predating 1975, which is the date Maine's comprehensive regulatory law governing automobile franchise relationships was enacted. "If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation ... such

Fed.R.Civ.P. 12(b)("If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment ...."). Alliance has also moved for summary judgment in its favor. Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Velez–Gomez v. SMA Life Assurance Co.*, 8 F.3d 873, 875 (1st Cir.1993).

## III. DISCUSSION

### A. Section 10 of L.D. 1294

Alliance contends Section 10 violates the Commerce and Contract Clauses of the United States Constitution. Alliance raises the same arguments here as it did in its Motion for Preliminary Injunction, which this Court rejected. The additional memoranda and factual statements have failed to generate any genuine issues of material fact or legal issues not previously disposed of in the preliminary injunction order.[3]

as the remedying of a broad and general social or economic problem." *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411–12, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). In *Acadia Motors, Inc. v. Ford Motor Co.*, 844 F.Supp. 819 (D.Me. 1994), *aff'd in part, rev'd in part on other grounds*, 44 F.3d 1050 (1st Cir.1995), Judge Brody addressed whether pre–1975 contracts were impaired by the 1975 regulatory law governing automobile franchise relationships:

To the extent that § 1176 impairs Ford's interest in its pre–1975 contracts, that section "rests on, and is prompted by, significant and legitimate state interests." *Energy*

There is no reason to alter this Court's earlier conclusions regarding the constitutionality of Section 10. *See Yes for Life Political Action Comm. v. Webster*, 84 F. Supp 2d. 150, 151 (D.Me.2000)(based on the summary judgment record, no reason to alter conclusions reached in the preliminary injunction order). Accordingly, the State is entitled to summary judgment on Alliance's claim that Section 10 violates the Commerce and Contract Clauses of the United States Constitution.

## B. Section 12 of L.D. 1294

Alliance next contends the composition of the Board, established by Section 12 of L.D. 1294, violates the Due Process Clause of the United States Constitution.

### 1. The Composition of the Board

Section 12, codified at 10 M.R.S.A. § 1187, provides:

The [Board] ... is established for the purpose of enforcing the provisions of this chapter.

**1. Membership.** The board consists of 7 members:

**A.** Six members appointed by the Governor:

(1) Three members who are or have been franchised new motor vehicle dealers in the State of Maine;

(2) A member who is or has been an employee or representative of a franchisor; and

(3) Two members of the public; and

**B.** One member appointed by the Secretary of State who is not and has not been either a motor vehicle dealer or manufacturer representative and who is an attorney employed by the

*Reserves*, 459 U.S. at 416, 103 S.Ct. at 707. The disparity in bargaining power between automobile manufacturers and their dealers prompted the Maine Legislature to enact legislation to protect dealers from actions by manufacturers that were perceived as abusive and oppressive. *See* Me. L.D. 1878, 109th Leg., 2d Sess. (Statement of Fact). The Legislature specifically wanted to prevent manufacturers, "unwilling to pay the fair and full price for repairs made necessary when their automobiles failed to meet warranty standards," to force dealers to shift costs of performing warranty work to nonwarranty customers. *Id.* The Court finds that the Legislature's concern for protection of dealers and the public is a significant and legitimate public purpose to support § 1176. The means chosen by the Legislature to implement these purposes is also reasonable, "particularly in light of the deference to which the [State] Legislature's judgment is entitled." *Energy Reserves*, 459 U.S. at 418, 103 S.Ct. at 708.

*Acadia Motors, Inc.*, 844 F.Supp. at 827–28; *see also Exxon Corp. v. Eagerton*, 462 U.S. 176, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983)(the effect of the pass-through prohibition law on existing contracts that did contain

such a provision was incidental to its main effect of shielding consumers from the burden of the tax increase); *New York Cent. R.R. Co. v. White*, 243 U.S. 188, 37 S.Ct. 247, 61 L.Ed. 667 (1917)(a workmen's compensation law may be applied to employers and employees operating under pre-existing contracts of employment that made no provision for work-related injuries); *Stone v. Mississippi*, 101 U.S. 814, 11 Otto 814, 25 L.Ed. 1079 (1879)(a law barring lotteries may be applied to lottery tickets that were valid when issued); *Boston Beer Co. v. Massachusetts*, 97 U.S. 25, 7 Otto 25, 24 L.Ed. 989 (1877)(a state prohibition law may be applied to contracts for the sale of beer that were valid when entered into).

Furthermore, the pre–1975 contracts expressly "recognize that the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement *and applicable law.*" *Ford Sales and Service Agreement Preamble,* page iii (emphasis added). Because the pre–1975 contracts incorporate applicable law, this Court concludes Alliance's reasonable expectations have not been substantially impaired by the enactment of Section 10. *See Alliance of Auto. Mfrs.*, 304 F.Supp.2d at 115–16.

Secretary of State and assigned to the Bureau of Motor Vehicles.[4]

## 2. The Duties of the Board and its Statutory Procedures

The Board is charged with reviewing complaints alleging violations of the Motor Vehicle Franchise Law and levying civil penalties for violations of the law. 10 M.R.S.A. § 1188(1), (3). It has the power to "conduct and use the same discovery procedures as provided in the Maine Rules of Civil Procedure," *id.* § 1189–A, such as to conduct a pre-hearing conference and to allow discovery, *id.* The Board has the power to hold hearings, *id.* § 1189, and to issue orders, *id.* § 1188(2). Its decisions must be in writing, *id.* § 1188(2), and are subject to appeal to the Superior Court, *id.* § 1189–B. If the appeal is on an issue of law, the superior court may not hear additional evidence and may not set aside the Board's decision, except for error of law. *Id.* § 1189–B(1). If the appeal is on an issue of fact, the superior court must presume all findings of fact of the Board are correct, unless rebutted by clear and convincing evidence. *Id.* § 1189–B(2). The appellant is entitled to trial by jury, but a copy of the Board's decision is admissible into evidence. *Id.*

The Board is given authority over "conduct governed by this chapter." *Id.* § 1188(1). If the Board determines that a violation of the Motor Vehicle Franchise Law has occurred, it is empowered to impose a civil penalty of "not less than $1,000 nor more than $10,000 for each violation." *Id.* § 1171–B(3). The chapter addresses such issues as limitations on establishing or relocating dealerships, *id.* § 1174–A, the rights of family members to succeed to franchise ownership, *id.* § 1174–C, product liability claims, *id.* § 1175, reimbursement for warranty claims, *id.* § 1176, written or oral agreements between manufacturers and franchisees, *id.* § 1178, and termination of the franchise, *id.* § 1179. In evaluating the amount of a civil penalty, the Board must consider a series of factors, including the seriousness of the violation and the economic damage to the public. *Id.* § 1171–B(3). The law does not eliminate a party's right to file a civil action in a court of competent jurisdiction, but if the action "gives rise or could give rise to a claim or defense under this chapter," the action must be stayed, if within 60 days after the filing of the complaint or service of process, whichever date is later, a party files a complaint with the Board, asserting the claims or defenses under the chapter. *Id.* § 1190–A.

## 3. Ripeness

This Court first addresses the State's assertion that Alliance's due process challenge to Section 12 is not ripe for judicial consideration because there is no actual proceeding before the Board and Alliance has not sought recusal under the Maine Administrative Procedure Act ("APA"), 5 M.R.S.A. § 9063.[5] Alliance, however, has mounted a facial challenge to Section 12, arguing by its terms, the law violates due

---

**4.** The member appointed by the Secretary of State acts as Chair. Section 12, L.D. 1294, codified at 10 M.R.S.A. § 1187(2). The Chair acts as the presiding officer, makes preliminary rulings, participates fully in board deliberations, and votes on the merits of complaints only to break a tie. 10 M.R.S.A. § 1187(2)(A)-(D).

**5.** 5 M.R.S.A. § 9063(1) provides:

Hearings shall be conducted in an impartial manner. Upon the filing in good faith by a party of a timely charge of bias or of personal or financial interest, direct or indirect, of a presiding officer or agency member in the proceeding requesting that that person disqualify himself, that person shall determine the matter as a part of the record.

process by depriving manufacturers of a "fair trial in a fair tribunal." *See Withrow v. Larkin*, 421 U.S. 35, 46, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975)(quoting *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)); *see also Gibson v. Berryhill*, 411 U.S. 564, 579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973)(holding that those with substantial pecuniary interest in legal proceedings should not adjudicate those disputes).

■ Facial challenges to statutes or regulations are commonly ripe as of enactment. *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 534, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992)(because petitioners' allegation "does not depend on the extent to which petitioners are deprived of the economic use of their particular pieces of property or the extent to which these particular petitioners are compensated, petitioners' facial challenge is ripe."). Purely legal or constitutional issues are generally fit for judicial adjudication, as they implicate no special agency expertise. *See, e.g., Pennell v. City of San Jose*, 485 U.S. 1, 11–15, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988)(while "as applied" due process and equal protection challenge to rent control ordinance was not ripe because it required factual context that could only be developed during agency proceedings, facial attack presented purely legal issues and was ripe for adjudication). Moreover, the Supreme Court has reached the merits of a facial due process claim, as raised here, without questioning ripeness. *See, e.g., Friedman v. Rogers*, 440 U.S. 1, 18, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979), *reh'g denied*, 441 U.S. 917, 99 S.Ct. 2018, 60 L.Ed.2d 389 (1979)(upholding the composition of the Texas Optometry Board against facial constitutional challenge). Thus, Alliance's facial challenge to Section 12 is ripe for judicial consideration.[6]

### 4. Due Process

Alliance asserts that manufacturers will be unable to receive a fair and impartial hearing because three seats on the seven-member Board are reserved for dealers and that there are no procedural safeguards to insure that members with pecuniary interests recuse themselves.

#### a. General Principles

■ A statute is presumed constitutional, and the "burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it," whether or not the basis has a foundation in the record. *Heller v. Doe*, 509 U.S. 312, 320–21, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (citation omitted). This Court is obligated to apply "the elementary rule" that "every reasonable construction must be resorted to in order to save a statute from unconstitutionality." *Hooper v. California*, 155 U.S. 648, 657, 15 S.Ct. 207, 39 L.Ed. 297 (1895). When faced with two possible constructions of a statute, one of which would raise "serious constitutional problems" while the other would not, courts are required to construe the statute to avoid such problems. *INS v. St. Cyr*, 533 U.S. 289, 299–300, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001).

■ Moreover, Alliance's "facial challenge to a legislative Act is, of course, the most difficult challenge to mount success-

---

**6.** The State's argument that Alliance's due process claim is not ripe because it failed to seek recusal of biased Board members under 5 M.R.S.A. § 9063 before bringing this claim is meritless since Alliance is not waging an "as applied" constitutional challenge, but rather a facial constitutional challenge. Because there has been no actual proceeding before the Board, Alliance has not yet had the opportunity to avail itself of the recusal methods in § 9063.

fully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); *see also Keystone Bituminous Coal Ass'n v. De-Benedictis*, 480 U.S. 470, 495, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987)("Petitioners thus face an uphill battle in making a facial attack on the Act as a taking."); *Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 77 (1st Cir.2001), *aff'd*, 538 U.S. 644, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003)("Because this is a facial challenge to a statute, PhRMA has a difficult burden of showing that Medicaid recipients will be harmed by the Maine Rx Program.").

The Supreme Court has long held that a "fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. at 136, 75 S.Ct. 623. The genesis of this principle can be traced at least to *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), a criminal case in which the Supreme Court held that if a judge had a "direct, personal, substantial pecuniary interest" in reaching a conclusion against a defendant, this would violate the defendant's right to due process. *Tumey*, 273 U.S. at 523, 47 S.Ct. 437; *see also New York State Dairy Foods, Inc. v. Northeast Dairy Compact Comm'n*, 198 F.3d 1, 13 (1st Cir.1999), *cert. denied*, 529 U.S. 1098, 120 S.Ct. 1833, 146 L.Ed.2d 777 (2000); *Esso Standard Oil Co. v. Cotto*, 389 F.3d 212, 218 (1st Cir.2004)(citing *Gibson*, 411 U.S. at 578–79, 93 S.Ct. 1689). Under one formulation, an interest is substantial if it "would offer a possible temp-

tation to the average ... judge to ... lead him not to hold the balance nice, clear[,] and true." *New York State Dairy Foods, Inc.*, 198 F.3d at 13 (quoting *Ward v. Vill. of Monroeville*, 409 U.S. 57, 60, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972)). "Participation of adjudicators who 'might conceivably have had a slight pecuniary interest,' however, does not offend due process." *Id.* (quoting *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986)). This basic requirement applies to administrative agencies. *Gibson*, 411 U.S. at 579, 93 S.Ct. 1689; *New York State Dairy Foods, Inc.*, 198 F.3d at 13.

■ Here, solely because three of the seven Board members are franchised dealers does not necessarily render the Board composition unconstitutional. Industry representation on regulatory boards is a "common and accepted practice." *New York State Dairy Foods, Inc.*, 198 F.3d at 13–14; *see also Friedman*, 440 U.S. at 18, 99 S.Ct. 887 (upholding such a scheme); *Stivers v. Pierce*, 71 F.3d 732, 743 (9th Cir.1995)("[T]he system of industry representation on governing or licensing bodies is an accepted practice throughout the nation."); *Abramson v. Gonzalez*, 949 F.2d 1567, 1579 (11th Cir.1992)(although many licensed psychologists and members of the licensing board are APA members, the plaintiffs have no right to a board composed of sympathetic examiners).[7]

### b. *Friedman v. Rogers*

In *Friedman*, the Supreme Court considered a challenge to a statute establish-

---

**7.** In *American Motors Sales Corp. v. New Motor Vehicle Board*, 69 Cal.App.3d 983, 138 Cal.Rptr. 594 (1977), the California Court of Appeal distinguished between the California New Motor Vehicle Board and a licensing or regulatory agency, which may constitutionally be composed in whole or in part of members of the business regulated, on the ground that the car dealers were not regulating their own

occupation, but rather were regulating their economic and contractual relations with car manufacturers. *Am. Motors Sales Corp.*, 138 Cal.Rptr. at 598–99 Be this as it may, the *American Motors* assertion that "car dealers have no unique or peculiar expertise appropriate to the regulation of business affairs of car manufacturers," *id.* at 599, overstates the point.

ing the Texas Optometry Board. Like the Board here, the Board in *Friedman* was comprised of a predetermined number of industry representatives. Four of the six members were "professional optometrists," and the remaining two were to be filled by "commercial optometrists." *Friedman*, 440 U.S. at 5–6, 99 S.Ct. 887. The plaintiff, a commercial optometrist, challenged the regulation of his profession by a board whose membership (professional optometrists) stood to gain directly by placing onerous restrictions on their competitors' practices. The Court rejected this claim, stating: "Although [the plaintiff] has no constitutional right to be regulated by a Board that is sympathetic to the commercial practice of optometry, he does have a constitutional right to a fair and impartial hearing in any disciplinary proceeding conducted against him by the Board." *Id.* at 18, 99 S.Ct. 887. Finding the latter right not implicated, the Court upheld the statute. In view of the Supreme Court's distinction between legislative and adjudicative functions, *Friedman*, although helpful, is not dispositive here, since the Board's function is adjudicative, not regulatory.

### c. New York State Dairy

In *New York State Dairy*, the First Circuit addressed an argument similar to the one Alliance makes here. Trade groups of milk producers outside New England sought to invalidate the authority of the Northeast Dairy Compact Commission on the ground, *inter alia*, that the composition of the Commission and the Hearing Panel, which consisted of New England dairy farmers, violated their due process rights.[8] Discussing the adjudica-

tive function, the First Circuit observed: "The Due Process Clause inquiry is slightly more complicated with respect to the Hearing Panel. This is not, in contrast to the issuance of regulations, a mere legislative function. The Hearing Panel sits as a quasi-judicial adjudicative body, and thus must comport with a higher standard of due process." *New York State Dairy Foods, Inc.*, 198 F.3d at 14. In examining the issue, *New York State Dairy* analyzed: 1) the degree of the potential financial interest on the part of individual panel members; 2) whether the Commission's own regulations provide due process safeguards; 3) whether the Commission members vote as individuals or as state delegates; and, 4) most significantly, whether there is a mechanism for disqualifying Commission members. *Id.* at 14–15. In this case, there is no evidence the Board has adopted any procedural regulations about the conduct of its hearings, although the law allows it to do so. *See* 10 M.R.S.A. § 1189 ("The hearing must be conducted pursuant to rules established by the board."). Further, the members apparently vote as individuals, not as delegates, a point that under *New York State Dairy*, favors Alliance.

On this record, however, this Court is left to speculate about the degree of the potential financial interest of the individual Board members. Alliance makes the bald statement that "[t]hree of the six normal voting members are dealers who have a financial incentive to vote against manufacturers." (*Pl.'s Mot. for Summ. J. & Supporting Mem. of Law* at 26 (Docket # 77)). But, contrary to Alliance's argument, this

---

8. The First Circuit quickly dispatched the plaintiffs' claims regarding the Commission's legislative function, noting that the "Due Process Clause sets a significantly lower bar for legislative functions." *New York State Dairy Foods, Inc. v. Northeast Dairy Compact Comm'n*, 198 F.3d 1, 13 (1st Cir.1999), *cert. denied*, 529 U.S. 1098, 120 S.Ct. 1833, 146 L.Ed.2d 777 (2000). To the extent the Board here assumes legislative functions, the result would be the same.

Court could as easily conclude that the impact of the financial incentive depends upon the nature of the dispute and the circumstances of the individual Board member. Would a childless automobile dealer in northern Maine have a "direct, personal and substantial" financial incentive to vote against the manufacturer in favor of a dealer in southern Maine regarding the right of a family member to succeed to the dealer's franchise under § 1174–C? Is the natural competition among dealers, a competition publicly aired with mind-numbing repetition by the dealers themselves, always going to be subordinated to their antagonism to the manufacturer? [9] *See Subaru of Am., Inc. v. State Bd. of Vehicle Mfrs., Dealers & Salespersons,* 842 A.2d 1003, 1010 (Pa.Cmwlth.2004)(quoting *Am. Motors Sales Corp. v. New Motor Vehicle Bd.,* 69 Cal.App.3d 983, 138 Cal.Rptr. 594, 600 (1977))(Regan, J., dissenting)("It is sheer speculation to conclude, absent a finding of actual bias, that a dealer-member has a pecuniary interest antagonistic to the manufacturer in disputes between dealer and manufacturer.").

Finally, turning to the last *New York State Dairy* factor, Alliance is simply wrong in contending there is no provision under state law for disqualification of a conflicted Board member. Under the Maine APA, 5 M.R.S.A. § 9063, the hearings for any adjudicatory proceeding must be "conducted in an impartial manner," and, upon the filing in good faith by a party of a timely charge of bias or personal or financial interest, direct or indirect, the challenged person "shall determine the matter as a part of the record." 5 M.R.S.A. § 9063(1). This process has been used with inevitably varying results. *See New England Tel. & Tel. Co. v. Pub. Utils. Comm'n,* 448 A.2d 272 (Me.1982); *Gashgai v. Bd. of Registration in Med.,* 390 A.2d 1080 (Me.1978); *Fitzgerald v. Baxter State Park Auth.,* 385 A.2d 189 (Me.1978). But, it is clearly available to the manufacturers.

On balance, as a facial attack on the constitutionality of the statute, and applying the *New York State Dairy* criteria, this Court concludes Alliance's argument fails.

### d.  *Alliance's Case Law*

Alliance relies upon *American Motors* and *Nissan Motor Corp. v. Royal Nissan, Inc.,* 757 F.Supp. 736 (E.D.La.1991). In each case, the court held that the membership of several car dealers on the motor vehicle board deprived a manufacturer litigant of due process because the board was not impartial.[10] Neither case, however, survives analysis.

---

**9.** *American Motors* also made the point that, even if in an individual case, a dealer voted with the manufacturer because the terminated franchise was a competitor or because it wished to obtain an advantage with its manufacturer, this would not be fair, but only equally unfair. *Am. Motors,* 138 Cal.Rptr. at 596. The "objectionable feature" of dealer-membership on the board was "the distinct possibility that a dealer-manufacturer controversy will not be decided on its merits but on the potential pecuniary interest of the dealer-members." *Id.* at 596–57, 138 Cal.Rptr. 594. Nevertheless, later in the opinion, the California Court of Appeal concluded, "we do not hold … that car dealers are biased solely because they are members of the dealer-class of litigants and are thus per se constitutionally ineligible to sit on the Board." *Id.* at 600. Rather, it was the combination of circumstances, including the mandated dealer-board members, the lack of any counterbalance in manufacturer members, the nature of the adversaries, and the nature of the controversies that rendered the board composition unconstitutional. *Id.*

**10.** The Board here, unlike the boards in *American Motors* and *Nissan Motor Corp. v. Royal Nissan, Inc.,* 757 F.Supp. 736 (E.D.La. 1991), includes a manufacturer member.

### i. *American Motors*

In *American Motors*, the manufacturer attempted to terminate a dealership for failure to develop a sufficient sales volume. *Am. Motors Sales Corp.*, 138 Cal.Rptr. at 595. Following a hearing, the hearing officer found "good cause" for termination. *Id.* The New Motor Vehicle Board disagreed. *Id.* The California New Motor Vehicle Board is a nine-member board; four members are new car dealers and the remaining five are public members. Cal. Veh.Code § 3001(a), (b). Although required to include four dealers, the board has no required manufacturer representative. *Am. Motors Sales Corp.*, 138 Cal. Rptr. at 596. On appeal, the superior court held sections of the California Vehicle Code violated due process under the state and federal Constitutions. *Id.* at 595.

In a two to one decision, the California Court of Appeal affirmed. The majority noted that dealer members of the board had an economic stake in every franchise termination and that it was to each dealer's advantage not to permit termination for low sales performance. *Id.* at 596. The Court of Appeal stated that a new car dealer was not per se biased to a degree that he could not serve on the board, but the combination of the mandated dealer board members, the lack of any counterbalance in mandated manufacturer members, the nature of the adversaries, and the nature of the controversy did not furnish an impartial tribunal. *Id.* at 600. The court observed that the objectionable feature of dealer membership on the board was the distinct possibility that a dealer-manufacturer controversy would be decided not on its merits but on the potential interest of the dealer members. *Id.* at 596–97. "Because the challenged Board members have a 'substantial pecuniary interest' in franchise termination cases ... their *Mandated* presence on the Board potentially prevented a fair and unbiased examination of the issues before it in this case, in violation of due process." *Id.* at 599 (emphasis added).

The controversy in California about the constitutionality of the New Motor Vehicle Board did not stop with *American Motors*. The California law provided that any existing automobile dealer could prevent the establishment or relocation of additional dealerships in the "same line-make" within ten miles of the dealership, initially by filing a protest and then by proving to the New Motor Vehicle Board that there is "good cause not to enter into a franchise establishing or relocating an additional motor vehicle dealership." *Chrysler Corp. v. New Motor Vehicle Bd.*, 89 Cal.App.3d 1034, 153 Cal.Rptr. 135, 136 (1979). Following *American Motors*, the California Legislature amended the statute to provide that no dealer could participate in a matter involving a protest. *Id.* at 137. Shortly thereafter, a three-judge panel of the federal district court held the ability of a dealer to prevent the establishment of a new competitor by filing a protest was a violation of due process. *Orrin W. Fox Co. v. New Motor Vehicle Bd.*, 440 F.Supp. 436 (C.D.Cal.1977). The United States Supreme Court reversed. *New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978).[11]

In 1979, the California Legislature reversed itself and provided that the dealer-members "may participate in, hear, and comment or advise other members upon, but may not decide" any matter involving a dealer-manufacturer dispute. *See British*

---

**11.** *Fox*, in passing, described the California New Motor Vehicle Board as "an impartial tribunal." *Orrin W. Fox Co.*, 439 U.S. at 108, 99 S.Ct. 403.

*Motor Car Distribs., Ltd. v. New Motor Vehicle Bd.*, 194 Cal.App.3d 81, 239 Cal. Rptr. 280, 283 (1987). But, this amendment met "a chilly reception" by the courts. *Id.* The board, in response, voluntarily began a policy of having all dealer members recuse themselves prior to any discussion of a grievance, *id.*, but even this was deemed insufficient. *Univ. Ford Chrysler–Plymouth, Inc. v. New Motor Vehicle Bd.*, 179 Cal.App.3d 796, 224 Cal. Rptr. 908 (1986).

In 1985, the California Legislature acted again. It amended the law to provide that "[a] member of the board who is a new motor vehicle dealer *may not participate in, hear, comment, advise other members upon, or decide* any matter considered by the board" which involves a dispute between a dealer and a manufacturer. *British Motor Car Distribs., Ltd.*, 239 Cal. Rptr. at 283–84. Finally, in 1986, the California Court of Appeal ruled this amended version of the statute constitutional. *Am. Isuzu Motors, Inc. v. New Motor Vehicle Bd.*, 186 Cal.App.3d 464, 230 Cal.Rptr. 769 (1986).

This extended history is of interest, because in the last analysis, when the statute was amended to provide for dealer member recusal, the California Court of Appeal upheld the statute's constitutionality. If mandatory dealer recusal ultimately satisfied the constitutional concerns of the California Court of Appeal, this Court must assume that case specific recusal pursuant to Maine statute would satisfy similar concerns. At the very least, in the context of a facial challenge, this Court cannot presume Maine courts would fail to enforce the bias provisions of Maine law.[12] *See* 5 M.R.S.A. § 9063(1); *see also Rite Aid Corp. v. Bd. of Pharmacy*, 421 F.Supp. 1161, 1169–71 (D.N.J.1976), *appeal dismissed*, 430 U.S. 951, 97 S.Ct. 1594, 51 L.Ed.2d 801 (1977)(three-judge panel rejects facial attack on New Jersey state pharmacy board composed of independent pharmacists).

### ii. *Royal Nissan*

In *Royal Nissan*, Nissan Motor Corporation sought a preliminary injunction to prevent the members of the Louisiana Motor Vehicle Commission from holding a hearing relating to a complaint by two dealers against Nissan's plans to establish a new dealership in Louisiana. *Royal Nis-*

---

**12.** This is not to imply that dealers as a class have an impermissible conflict whenever addressing any aspect of any possible dealer-manufacturer dispute. Even *American Motors* did not go that far. It is only to point out that this Court is required to presume the legislative act constitutional. It may or may not be that an individual dealer confronting a specific issue has an impermissible conflict under 5 M.R.S.A. § 9063(1). *See Rite Aid Corp. v. Bd. of Pharmacy*, 421 F.Supp. 1161, 1170, n. 18 (D.N.J.1976), *appeal dismissed*, 430 U.S. 951, 97 S.Ct. 1594, 51 L.Ed.2d 801 (1977)("While we see nothing on the face of N.J.S.A. 45:14–1 which violates due process, we, of course, do not foreclose the plaintiffs from arguing that an individual Board member has a substantial pecuniary interest or bias in the outcome of any Board proceeding.").

Moreover, this analysis assumes *arguendo* the validity of the *American Motors* line of cases. The *American Motors* case has been subjected to thorough criticism, *see, e.g., Subaru of Am., Inc. v. State Bd. of Vehicle Mfrs., Dealers & Salespersons*, 842 A.2d 1003, 1009–10 (Pa.Cmwlth.2004); *Gen. Motors Corp. v. Capitol Chevrolet Co.*, 645 S.W.2d 230, 232 (Tenn.1983), and other state courts have concluded similar statutes are constitutional, *see, e.g., Gen. GMC Trucks, Inc. v. Gen. Motors Corp.*, 239 Ga. 373, 237 S.E.2d 194, 195–97 (1977), *cert. denied*, 434 U.S. 996, 98 S.Ct. 634, 54 L.Ed.2d 491 (1977); *Ford Motor Co. v. Pace*, 206 Tenn. 559, 335 S.W.2d 360, 367–69 (1960), *appeal dismissed*, 364 U.S. 444, 81 S.Ct. 235, 5 L.Ed.2d 192 (1960), *reh'g denied*, 364 U.S. 939, 81 S.Ct. 377, 5 L.Ed.2d 371 (1961).

san, Inc., 757 F.Supp. at 737. The nine-member Louisiana Commission consisted only of dealers, and the district court concluded that the dealers' interest "lays in preventing the manufacturer from creating another dealership that cuts into the existing dealers' market area." Id. at 740. The court stated it could think of "no interest that the dealers would have in allowing Nissan to limit their market area and to create new competition." Id. The district court granted a preliminary injunction.[13] Id. at 740–41.

One significant difference between the Louisiana board in Royal Nissan and the Board here is that in Louisiana, the nine-member board consisted only of dealers; whereas, in Maine, the Board has a majority of non-dealer members. In Maine, even assuming the dealers voted as a bloc and the manufacturer always voted with its perceived interest, because the chair does not vote except to break a tie, the dealers must convince at least one of the public members to vote with them to obtain a majority.[14] If the two public members were to vote with the manufacturer, the resulting tie would be broken by the chair, an attorney employed by the Maine Secretary of State.

It is noteworthy that the Royal Nissan decision distinguishes its facts from a prior Fifth Circuit case, Chrysler Corp. v. Texas Motor Vehicle Commission, 755 F.2d 1192 (5th Cir.1985), reh'g denied, 761 F.2d 695 (5th Cir.1985). See Royal Nissan, Inc., 757 F.Supp. at 740. In Chrysler, the Fifth Circuit, addressing the perennial issue of warranty reimbursements, pointed out:

The predictors of bias here point in opposite directions. Perhaps the dealers on the Commission will be unsympathet-ic to manufacturers who contend that a claimed defect was only an inept repair effort by a dealer. Yet, we can equally speculate, if we are to speculate, that a dealer will be quick to find fault with his direct competitor—— the dealer.

Chrysler Corp., 755 F.2d at 1199. Under Chrysler, if the Maine Board were faced with a dealer warranty dispute, (ironically the dispute that underlies this law suit), the Fifth Circuit would conclude there is no inherent dealer bias.

### e. Due Process Conclusion

Royal Nissan and American Motors involved "as applied" challenges to their state boards; neither was a facial assault on their overall constitutionality. Even if courts under different schemes concluded that boards with dealer members could not properly decide specific issues of dealer termination and new competitive dealerships, this is scant authority for a wholesale declaration that the Board in Maine is fatally flawed for all purposes. See Gen. Motors Corp. v. Capitol Chevrolet Co., 645 S.W.2d 230, 237 (Tenn.1983); Gen. GMC Trucks, Inc. v. Gen. Motors Corp., 239 Ga. 373, 237 S.E.2d 194, 195–97 (1977), cert. denied, 434 U.S. 996, 98 S.Ct. 634, 54 L.Ed.2d 491 (1977); Ford Motor Co. v. Pace, 206 Tenn. 559, 335 S.W.2d 360, 367–69 (1960), appeal dismissed, 364 U.S. 444, 81 S.Ct. 235, 5 L.Ed.2d 192 (1960), reh'g denied, 364 U.S. 939, 81 S.Ct. 377, 5 L.Ed.2d 371 (1961).

Like the Fifth Circuit in Chrysler, this Court cannot draw the conclusion based on this record that the personal financial circumstances of each dealer member on the Board will invariably cause them to unite against the manufacturers on all issues.

---

13. There was no appellate review of the merits of Judge Mentz's decision in Royal Nissan.

14. This illustration assumes all members are present. There are, of course, a number of permutations depending on who is present at any given hearing.

The possibility the Board would not conduct a fair and impartial hearing is an argument grounded on unwarranted speculation, and this record falls far short of demonstrating, as required by *Salerno*, "no set of circumstances" under which the act could be valid.[15]

## IV. CONCLUSION

Defendants' Motion for Summary Judgment is GRANTED, and Plaintiff's Motion for Summary Judgment is DENIED.

---

**15.** On December 21, 2004, Amicus Curiae, Maine Auto Dealers Association, brought to this Court's attention the First Circuit decision, *Esso Standard Oil Co. v. Cotto*, 389 F.3d 212 (1st Cir.2004). *Esso Standard Oil* considered the abstention doctrine in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) to determine whether a federal court should issue an injunction based on allegations of bias against a state administrative agency despite an ongoing state proceeding. None of the parties has raised an abstention argument here and there is no ongoing state proceeding. *Esso Standard Oil* is inapposite.